UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINEAR GROUP SERVICES,

    Plaintiff,

vs.

Case No. 13-10108
HON. GERSHWIN A. DRAIN

ATTICA AUTOMATION, INC.,

    Defendant.
_____/

## OPINION AND ORDER REGARDING CLAIM CONSTRUCTION

### I.    INTRODUCTION

On January 11, 2013, Linear Group Services, LLC ("Linear") filed the present action against Attica Automation, Inc. ("Attica"), seeking a declaration that Linear's technology does not infringe Attica's U.S. Patent No. 6,787,724 ("the Patent"), or, in the alternative, a declaration that the Patent is invalid. On February 28, 2013, Attica brought a counterclaim against Linear and ND Industries, Inc. ("ND") alleging direct and indirect infringement of Attica's Patent.

Presently before the Court is claim construction. The parties submitted a Joint Claim Construction Chart [#42] on October 15, 2013, *Markman* briefs on November 5, 2013 [#45 and #46], Responses on December 5, 2013 [#48 and #49], and Replies on December 23, 2013 [#53 and #54]. The Court heard oral arguments on January 29, 2014.

### II.    TECHNOLOGY BACKGROUND

On September 7, 2004, Attica was granted the Patent for a sorting machine, which is used during the manufacture of mass quantities of fasteners, such as bolts and screws, with the purpose

of separating the nonconforming fasteners from the conforming fasteners. The abstract of the Patent states:

> A sorting machine receives a bulk of workpieces or fasteners from a hopper unit into a feed station which align the fasteners into a single file for engagement to a transport system of an inspection station. Preferably, the transport system has a conveyor belt with a magnetic member disposed radially inward from the belt. The fasteners are preferably ferrous and thereby engage the conveyor belt via the magnetic field which penetrates the belt. The fasteners are thus carried along the transport system past a trigger sensor which sends a signal to a central controller to timely actuate a dimensional sensing apparatus which takes an image of the fastener and sends it to the central computer for dimensional analysis. If the fastener fails to meet pre-established guidelines the nonconforming fastener is ejected from the transport system via a reject mechanism. If the fastener conforms, it continues to move along the transport system, past a counter sensor and is then dropped off the conveyor belt of the transport system into a packaging station for ultimate delivery to the customer.

*See* Patent, 1:39-57.

## II.     CLAIM CONSTRUCTION

### A.     Standard of Review

A determination of patent infringement requires a two-step analysis. *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1476 (Fed. Cir. 1998). "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Id.* Claim construction is an issue of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-91 (1996).

In interpreting claims, a court "should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F. 3d 1576, 1582 (Fed. Cir. 1996). Absent an express intent to impart a novel meaning, "terms in a claim are to be given their ordinary and accustomed meaning." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). "It is the *claims* that measure the invention." *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107,

1121 (Fed. Cir. 1985) (emphasis in original). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

Although accorded less weight than intrinsic evidence, extrinsic evidence, such as expert testimony, dictionaries, and treatises, can also be helpful. *Id.* at 1317. Therefore, extrinsic evidence "may be considered if the court deems it helpful," provided the court "attach[es] the appropriate weight" to extrinsic sources "in light of the statutes and policies that inform patent law." *Id.* at 1317-18, 1324.

The "bedrock principle of patent law" is that "the claims of a patent define the invention to which the patentee is entitled the right to exclude" and the "written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims." *Id.* at 1312 (quoting *Markman*, 52 F.3d at 980). Thus, claim construction always begins with the language of the claim and asks "how a person of ordinary skill in the art understands a claim term." *Id.* at 1317. A "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313.

The prosecution history "inform[s] the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317. The Federal Circuit has held:

> The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution. Accordingly, where the

3

patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender.  Such a use of the prosecution history ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers.

*Chimie v.  PPG Indus*., 402 F.3d 1371, 1384 (Fed.  Cir.  2005).

### B. Claim 1 of the Patent

In the instant dispute, Linear seeks construction of three terms in Claim 1 of the Patent. Conversely, Attica requests that the Court assign the "ordinary and customary" meaning to these terms.  Claim 1 states:

> 1. A sorting machine for inspecting and sorting a workpiece, the sorting machine comprising:
>
> a central controller;
>
> a hopper unit for bulk storage of a plurality of workpieces;
>
> **a feed station having a distribution assembly and a belt drive system**, wherein the plurality of workpieces loosely fall from the hopper unit into the distribution assembly and wherein the belt drive system receives the plurality of workpieces in an orderly fashion from the distribution assembly;
>
> an inspection station having a variable speed transport system, a trigger sensor, a dimensional sensing apparatus, and a **reject mechanism**, wherein the transport system receives the plurality of workpieces one-by-one in a linear fashion and each respective one of the workpieces travel via the transport system past the trigger sensor sensing apparatus disposed along the transport system and between the trigger sensor and the reject mechanism; and
>
> **wherein the central controller receives a dimension signal from the sensing apparatus and activates the reject mechanism to remove the respective one of the plurality of workpieces from the transport system if the respective one of the plurality of workpieces in nonconforming**.

*See* Patent at 7:50-67 and 8:1-9 (emphasis added).

### C. Disputed Terms

      1.      "a feed station having a distribution assembly and a belt drive system"

| Linear's Proposed Construction |
|---|
| A station that feeds uninspected workpieces from a hopper to a separate inspection station. The feed station includes a) a distribution assembly and b) a belt drive system, but does not inspect any workpieces. |
| **Attica's Proposed Construction** |
| The ordinary and customary meaning. |

Here, Linear argues it is clear from the claim language that the feed station feeds workpieces from a hopper to a separate inspection station and that the station includes a distribution assembly and a belt drive system. Linear further asserts that the workpieces fed from the hopper to the feed station are uninspected workpieces. Linear maintains the Patent Office originally rejected Claim 1 as being unpatentable and, in response to the rejection, Attica limited Claim 1 to a feed station that does not inspect the workpieces.

Alternatively, Attica maintains that the terms should be given their ordinary and customary meaning. Attica further asserts that Linear is improperly attempting to import imitations from the specification and misconstrues the prosecution history rendering its proposed construction wholly contrary to the guiding tenets of claim construction. The Court agrees.

Here, Linear relies on the following language in the specification in support of its proposed construction:

> More particularly, once manufactured, the un-inspected fasteners are stored within a hopper or bulk dumpster unit of the sorting machine and thus are staged to be fed into a fastener feed station located adjacent to the hopper unit.

*See* Patent 3:2-5. Linear's attempt to import limitations from the specification into Claim 1 based on the inventor's description of the preferred embodiment in the specification is contrary to law.

5

*See Comark Commc'n, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998). In *Comark*, the Federal Circuit expressly rejected the defendant's attempt to limit the scope of the claim based on the language in the specification:

> [T]he language that Harris argues should limit claim 1 is clearly found in the '904 patent's description of the preferred embodiment. It is precisely this type of claim construction that our prior case law counsels. Appellant misinterprets the principle that claims are interpreted in the light of the specification. Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments appearing in the specification will not generally be read into the claims.

*Id.* at 1187. Additionally, in *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000), the court recognized that claims may be construed so as to better understand or explain, however they may not be changed or rewritten. To overcome a construction presumption "in favor of the ordinary meaning of claim language, "a party wishing to use statements in the written description to confine or otherwise affect a patent's scope must, at the very least, point to a term or terms in the claim with which to draw in those statements." *Renishaw*, 158 F.3d at 1248. Linear fails to point to any term in Claim 1 to support its use of the phrase "uninspected."

Linear's argument concerning the prosecution history is similarly without merit. Linear argues that during the prosecution of the Patent, the patentee "limited Claim 1 to a feed station that does not inspect the workpieces." However, Linear has failed to demonstrate an "unequivocal intent" by the patentee to limit Claim 1's scope. *See Omega v. Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003) ("[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable.") (footnote omitted); *Chimie*, 402 F.3d at 1384. If the applicant's statements are equivocal, ambiguous or incomplete in any way, the doctrine of prosecution disclaimer does not

apply. *Omega*, 334 F.3d at 1324. Attica did not in any way surrender the scope of Claim 1. Rather, the examiner issued an Office Action making a non-final rejection of Claim 1 on obviousness grounds, and stated that the Patent was unpatentable over the prior art Kato patent (U.S. Patent. No. 4,457,622), which was also a sorting machine for inspecting and sorting workpieces.

Contrary to Linear's suggestion, "uninspected workpieces" was not the focus of the rejection of the Patent, nor did Attica's argument to overcome the rejection focus on whether or not the workpieces are inspected at the feed station. Instead, discussion focused on differentiating the Patent from the prior art Kato patent based on the examiner's misinterpretation of (1) "a variable speed transport system" and (2) a "distribution assembly." *See* Attica's Resp., Ex. D. Under analogous circumstances, in *Purdue Pharma L.P. v. Endo Pharm., Inc.*, 438 F.3d 1123 (Fed. Cir. 2006), the court declined to find a disavowal of a claim scope based on a distinction identified by the patentee to overcome the prior art, because the distinction was not a "necessary feature" of the drug formulations claimed in the application. *Id.* at 1136. The instant case is similar to *Purdue*, in that neither the examiner's rejection, nor Attica's arguments to overcome the rejection centered on whether workpieces are inspected at the feed station. *See* Attica's Resp., Exs. C and D. Thus, Attica's peripheral comments regarding inspection of the workpieces cannot now be read to signal a "clear and unmistakable" intent by Attica to narrow the claim scope. *See Omega*, 334 F.3d at 1325.

Finally, Linear's addition of the term "separate" is gratuitous. Linear provides no explanation as to why such an addition is necessary. When the meaning of a claim can be readily understood by the jury as written, no additional construction is necessary. *Philips*, 415 F.3d at 1314. Based on the foregoing considerations, the Court concludes that this term should be given its ordinary and

customary meaning.

2. "reject mechanism"

| **Linear's Proposed Construction** |
|---|
| This is a means-plus-function limitation limited to: a) a pivoting flipper having a rigid plate, b) an electro-magnet controlled by a controller, c) a passive magnet engaged to a vertically moving rod, and equivalents thereof. |
| **Attica's Proposed Construction** |
| The ordinary and customary meaning. |

Linear argues that "reject mechanism" is a means-plus-function clause pursuant to 35 U.S.C. § 112, ¶6 which states that "an element in a claim for a combination may be expressed as a means...for performing a specified function without the recital of structure,...such a claim shall be construed to cover the corresponding structure...described in the specification and equivalents thereof." Linear argues that "reject mechanism" simply means "mechanism for rejecting," and the term connotes no structure whatsoever.

Contrary to Linear's argument, "reject mechanism" is not a means-plus-function limitation. A claim term that does not include the word "means" triggers a rebuttable presumption that § 112 does not apply. *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002). The word "means" is not used in Claim 1. Thus, there is a presumption that "reject mechanism" is not subject to the means-plus-function limitation.

In *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580 (Fed. Cir. 1996), the court held that "detent mechanism" did not fall under a § 112 means-plus-function limitation. *Id.* at 1583. The *Greenberg* court held in pertinent part:

[T]he fact that a particular mechanism–here 'detent mechanism' –is defined in

> functional terms is not sufficient to convert a claim element containing that term into a 'means for performing a specified function' within the meaning of section 112(6). Many devices take their names from the functions they perform. The examples are innumerable, such as 'filter,' 'brake,' 'clamp,' 'screwdriver,' or 'lock.'

*Id.* In *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354 (Fed. Cir. 2004), the Federal Circuit reaffirmed the holding in *Greenberg*, stating:

> In considering whether a claim term recites sufficient structure to avoid application of section 112 ¶ 6, we have not required the claim term to denote a specific structure. Instead, we have held that it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function.

*Id.* at 1359-60; *see also Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 649 F.3d 1350, 1360 (Fed. Cir. 2011) ("[W]hether claim language invokes § 112, ¶6 depends on how those skilled in the art would understand the structural significance of that claim language, assessed against the presumptions that flow from a drafter's choice to employ or not employ the term 'means'").

Additionally, in *Personalized Media Commc'n v. Int'l Trade Comm'n*, 161 F.3d 696 (Fed. Cir. 1998), the Federal Circuit reversed a finding that the term "digital detector" should be construed as a means-plus-function limitation under § 112, ¶6 where it was demonstrated that "detector" had a well-known meaning to those of skill in the electrical arts connotative of structure. *Id.* at 704-05. The *Personalized Media* court held that a means-plus-function limitation did not apply even though "detector" did not evoke a specific physical structure in the minds of those of skill in the art, but instead evoked a variety of structures. *Id.* at 705. In the instant case, a review of numerous patents which predate the Patent, testimony from an expert in the art of inspection and sorting, and testimony one of the Patent's inventors show consistent usage for over 30 years of the term "reject

mechanism." *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1584 (Fed. Cir. 1996) (extrinsic evidence may be used to help the court come to the proper understanding of the claims in question). To those skilled in the art, "reject mechanism" means a variety of structures that perform the reject mechanism.

Here, expert testimony confirms that "reject mechanism" connotes a variety of structures that perform the reject function. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999) (approving the use of expert testimony to aid in understanding the technology of the patent claims from the vantage point of one skilled in the art). Mike Nygaard ("Nygaard"), is the President of General Inspection LLC, which manufactures a complete line of gauging, sorting, and inspection systems. *See* Attica's Brief, Ex. G. Nygaard is also the inventor of numerous patents in the inspection and sorting field. *Id*. According to Nygaard, someone clearly skilled in the sorting art would understand "reject mechanism," to connote numerous types of structures. Specifically, Nygaard explained that:

> In August 2001, a "reject mechanism" in an inspection and sorting machine could be implemented in a number of equivalent embodiments then known. For example, a "reject mechanism" could remove a nonconforming workpiece in a number of ways, by (i) routing the workpiece on a conveyor to a bin for nonconforming parts, (ii) mechanically displacing the workpiece from a conveyor into a bin, such as by a flipper or pusher device, (iii) magnetically displacing a (ferrous) workpiece by selective actuation of a magnet, (iv) pneumatically displacing the workpiece into a bin, such as by pressurized air, (v) using a robotic arm to pick up and remove the nonconforming workpiece, among other equivalent ways.

*Id.* at ¶ 9. Nygaard further provides examples of the various types of reject mechanisms offered by his own company. *Id.*

In addition to expert testimony, inventor testimony is another admissible form of extrinsic evidence. *See Voice Techs. Group, Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999) ("An

inventor is a competent witness to explain the invention and what was intended to be conveyed by the specification and covered by the claims."). William Bennett ("Bennett"), one of the inventors of the Patent, has worked in the fastener inspection industry for over twenty-eight years. *See* Attica's Brief, Ex. H. Bennett testified in his declaration that "reject mechanism" had, and still has today, definite structural connotations to a person of ordinary skill in the inspection and sorting art. *Id.* at ¶¶ 10-11.

Based on the extrinsic evidence, a reject mechanism can take on numerous structural embodiments for the purpose of removing a nonconforming workpiece or fastener. Therefore, the term reject mechanism is not a means-plus-function limitation and the Court will assign the ordinary and customary meaning to this term.

> 3. "wherein the central controller receives a dimension signal from the sensing apparatus and activates the reject mechanism to remove the respective one of the plurality of workpieces from the transport system if the respective one of the plurality of workpieces is nonconforming."

| **Linear's Proposed Construction** |
|---|
| A sensing apparatus sends an image signal to the central controller, which [reject mechanism] then makes active the reject mechanism, which then removes a defective or malformed workpiece form the inspection station transport system while non-defective or properly formed workpieces continue to be transported by the inspection station transport system. |
| **Attica's Proposed Construction** |
| The ordinary and customary meaning. |

Linear argues that its proposed construction fully comports with the intrinsic record, as the specification describes how the reject mechanism (1) removes the defective, malformed workpieces, (2) how the non-defective workpieces continue to be transported by the transport system, and (3) explains that the rejection of the defective workpieces occur by the controller sending a signal to the

11

reject mechanism in order to activate the reject mechanism and remove the part. As such, Linear maintains that it has not improperly imported limitations into Claim 1.

Here, contrary to Linear's argument, the Court finds that there are no ambiguities in Claim 1's language that require clarification. Linear's proposed construction does not clarify any of the terms. Rather, it creates unnecessary confusion and inexplicably replaces the term "dimensional signal" with the term "image signal," erases the term "nonconforming" and uses the new terms "non-defective or properly formed." The purpose of claim construction is to help the jury understand the meaning and scope of the claims as written. *See Embrex*, 216 F.3d at 1347 (Claim construction is "simply a way of elaborating the normally terse claim language, in order to understand and explain, but not to change, the scope of the claims."); *see also Philips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").

Linear is in essence requesting the Court find that Claim 1 is limited to the preferred embodiment described in the specification. However, "[a]n applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1305-06 (Fed. Cir. 2003) (internal citation omitted). As such, it is well settled that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal citations omitted); *see also Phillips*, 415 F.3d at 1323 ("[W]e have expressly rejected

12

the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.").

The Patent's specification describes the invention as a device that separates defective and non-defective fasteners, without regard to whether the means of separation is to remove the defective pieces from the transport system and send non-defective pieces through, or the reverse:

> [T]he present invention is a sorting machine of workpieces. The machine inspects and segregates out non-conforming or defective workpieces from conforming workpieces which meet pre-established dimensional guidelines assuring or maintaining the quality of the product which is ultimately sent to the customer.

Patent at 2:52-58. The patentee then describes the preferred embodiment is separation of defective and non-defective pieces via a mechanism that removes defective pieces from the transport system, with the goal that "only the conforming, properly formed, and non-defective fasteners . . . are ultimately made available for sale to the public." *Id.* at 2:67-3:2. However, the patentee nowhere expressly disclaims mechanisms that alternatively remove the non-defective pieces from the transport system. The Patent specifically states that "[a]lthough the preferred embodiments of the present invention have been disclosed, various changes and modifications may be made thereto by one skilled in the art without departing from the scope and spirit of the invention . . . ." *Id.* at 7:41-48. Thus, a machine that accomplishes segregation by removing non-defective workpieces from the transport system, such that "only properly formed, and non-defective fasteners are ultimately made available for sale to the public," is within the stated scope of the Patent. *Id.* at 2:67-3:2.

The cases relied on by Linear are distinguishable from the present matter because in those cases, the court found that a narrow construction was appropriate because the patentees expressly disavowed alternate embodiments in the specification and/or the prosecution history. *See Wang Labs. Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1381-84 (finding that the patentee expressly

disclaimed the alternate embodiment during prosecution); *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1369-72 (Fed. Cir. 2003) (patentee distinguishes invention from the alternate embodiment in the specification and during prosecution); *Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 1364-65 (Fed. Cir. 2004) (specification expressly limited invention to a specific definition and during prosecution patentee distinguished alternate embodiment from prior art); *Retractable Techs., Inc. v. Becton, Dickinson and Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (patentee expressly distinguished the invention from prior art featuring the alternate embodiment). There is no similar disclaimer in either the Patent's specification or the prosecution history.

As such, there is no basis to limit the scope of Claim 1 as proposed by Linear and the Court will likewise assign the ordinary and customary meaning to this term.

## IV. CONCLUSION

Based on the aforementioned arguments, the Court declines to adopt Linear's proposed constructions of the Patent's disputed terms and will assign the ordinary and customary meaning to these terms.

SO ORDERED.


Dated: February 12, 2014                       /s/Gershwin A Drain
                                               GERSHWIN A. DRAIN
                                               UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
February 12, 2014, by electronic mail.

/s/ Tanya Bankston
Deputy Clerk